AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Northern District of California

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. |
| ) | |
| Marwan Hamood Mohamed Alghazali ) | 3 16 70325 |
| a/k/a Marwan Mosed Omar ) | |
| ) | |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __April 4, 2011__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1542 | False Statement in Application and Use of Passport |
| | Maximum Penalties: 10 years' imprisonment; $250,000 fine; 3 years' supervised release; $100 mandatory special assessment |

This criminal complaint is based on these facts:

Please see attached affidavit of Special Agent Aaron Ure in support of Criminal Complaint.

(approved as to form /s/ AUSA Andrew F. Dawson)

☑ Continued on the attached sheet.

*Complainant's signature*

Aaron Ure, Special Agent, U.S. Dep't of State
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/15/16

*Judge's signature*

City and state: San Francisco California

Hon. Joseph C. Spero, Chief Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, AARON URE, Special Agent with the U.S. Department of State, Diplomatic Security Service, being duly sworn, hereby depose and state:

### INTRODUCTION

1. I submit this affidavit in support of a criminal complaint charging MARWAN HAMOOD MOHAMED ALGHAZALI aka MARWAN MOSED OMAR with making a false statement in an application for a United States passport, in violation of Title 18, United States Code, Section 1542. In summary, I allege and believe probable cause exists that he lied about his name and bloodline family relationships on various United States passport application forms in the Northern District of California, further described below.

### AGENT BACKGROUND

2. I am a Special Agent with the U.S. Department of State (DOS), Diplomatic Security Service, currently assigned to the San Francisco Field Office. I have been employed as a Special Agent since January 5, 2009. My duties include conducting investigations and protecting U.S. government officials and foreign dignitaries. I completed the Diplomatic Security Training Center's Basic Special Agent Course and the Federal Law Enforcement Training Center's Criminal Investigator's Training Program where I received specialized training in conducting investigations of federal offenses, including passport fraud, visa fraud, and identity fraud. Prior to joining the Diplomatic Security service, I was employed with Customs and Border Protection (CBP) as a Border Patrol Agent from January 2002 to September 2006. I have successfully completed the United States Border Patrol Academy located in Charleston, South Carolina. As a Border Patrol Agent, I participated in numerous arrests, interviews, and investigations of persons who have violated the immigration laws of the United States. In

September of 2006, I transferred to ICE (Immigration and Customs Enforcement), accepting a position as a Deportation Officer. As a Deportation Officer, my duties and responsibilities included overseeing the removal proceedings of those found to be illegally present in the United States. I was responsible for arresting individuals for immigration violations, reviewing alien files in connection with the detention and release of individuals in ICE custody, and making custody determinations.

3. I have been personally involved in the investigation of this matter. This affidavit is based on information obtained from law enforcement and government personnel; voluntary statements; my personal knowledge and observations; and my examinations of various reports, documents, records, and computer databases. Unless otherwise indicated, when the contents of a document, or an individual's statement, are reported herein, they are reported in substance and part and are not intended to be a verbatim recitation of the document or statement. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of a criminal complaint, it does not include all the facts known to me or other government personnel.

## APPLICABLE LAW AND CRIMINAL CONDUCT

4. Title 18, United States Code, Section 1542 makes it a crime for a person willfully and knowingly to make any false statement in an application for a passport with the intent to induce or secure the issuance under a passport of the United States contrary to the laws or rules prescribed regarding the issuance of passports. The statute of limitations for passport fraud is 10 years, pursuant to 18 United States Code, Section 3291.

5. According to DOS passport regulations (contained at 22 C.F.R. part 51), a passport applicant is required to submit a passport application and to answer truthfully all

questions and state every material fact pertaining to his or her eligibility for a passport. All information submitted in connection with a passport application is considered part of the application.

6.  Title 18, United States Code, Section 3238 provides venue for offenses committed overseas if they are indicted or if an information is filed in the District where the offenders were last known to have resided. The defendant is known to have been residing in San Francisco and the Northern District of California throughout the period of the alleged offenses, and is currently residing there.

7.  Various provisions of the Immigration and Naturalization Act permit American citizens to obtain immigration benefits from temporary or immigrant visas up and through lawful permanent residence status and full citizenship, for their bloodline foreign born children and foreign family members, if they meet certain criteria. So called derivative citizenship fraud, bloodline fraud, or transmission fraud happens when an American citizen claims that a non-bloodline person is their child or family member and then files applications for passports or immigration benefits on their behalf, falsely claiming them as bloodline relatives. This case concerns derivative citizenship fraud allegations.

## STATEMENT OF PROBABLE CAUSE

### A. The Interview in Sana'a Yemen and ALGHAZALI/OMAR Statement

8.  On August 14, 2012, an individual identified as Mosed Shaye Omar appeared at the United States Embassy in Sana'a, Yemen, to document his alleged minor child, Karamah Mosed Shaye Omar, as a U.S. Citizen, and he filed an application for a United States passport for her. As part of her passport application and documentation process, the person purporting to be Mosed Shaye Omar submitted, among other documents, an "Affidavit of Residence and

Paternity and Maternity," a required government form, to a federal Consular Officer employed by the Department of State. I reviewed this affidavit and observed that he listed having several children in addition to this daughter, two of whom were named Marwan and Nageeb with a date of birth years of 1983 and 1977 respectively. Mosed Shaye Omar signed this affidavit under a statement warning him of criminal punishment under Title 18, United States Code, Sections 1001 and 1542 for knowingly and willfully submitting a false statement. During adjudication of this daughter's citizenship and passport application, the Consular Officer identified patterns of fraud and referred this case to a DSS Special Agent for further investigation.

9.   On January 23, 2013, DSS Special Agent David Howell and a Consular Fraud Investigator serving as a translator interviewed the person purporting to be Mosed Shaye Omar at the American Consulate in Sana'a, Yemen. During the interview, Mosed Shaye Omar admitted in a voluntary sworn statement that his true and correct name is Yasin Mohamed Ali Alghazali (referred to hereafter as "ALGHAZALI/OMAR"). He stated that he was born to the parents of Mohamed Ali Alghazali and Karama Ahmed Alghazali. He stated that neither of his parents were U.S. citizens and that neither had ever been to the United States. He also stated that he was smuggled to the U.S. by Rashid Ali Almadhrahi who fraudulently claimed to be his father (a so-called derivative fraud not charged in this complaint). ALGHAZALI/OMAR stated that Rashid Ali Almadrahi was in fact a distant uncle on his mother's side of the family.

10.  A search of Department of State records revealed that ALGHAZALI/OMAR entered the United States on April 30, 1972, as the unmarried son of a Lawful Permanent Resident and using the name Mosed Shaye Omar. He naturalized as a U.S. citizen on April 10, 1978 using that same name. On November 5, 2007, he filed an Application for a U.S. Passport

(form DS-11) at the San Francisco Treasurer using the name Mosed Shaye Omar. There was a criminal warning on this passport application.

11.     Also during the January 23, 2013 interview, ALGHAZALI/OMAR admitted that he smuggled two nephews to the U.S. claiming them as biological children on immigrant visa applications. He stated that the two people are Nagib (or Nageeb) Omar (Claimed Son #1) and MARWAN MOSED OMAR (Claimed Son #2). ALGHAZALI/OMAR stated that Nagib's true and correct name is Fawzi Ali Mohamed Alghazali. He stated that MARWAN's true and correct name is MARWAN HAMOOD MOHAMED ALGHAZALI. He stated that neither Fawzi Ali Mohamed Alghazali or MARWAN HAMOOD MOHAMED ALGHAZALI is his or his wife's child.

12.     A search of DOS records revealed that Claimed Son #1, Fawzi Ali Mohamed Alghazali, entered the United States on September 24, 1977 using the identity Najib Omar. Claimed Son #1 derived citizenship on June 7, 1994 using the identity Nagib Omar. On June 19, 2003, Claimed Son #1 submitted an Application for U.S. Passport (form DS-11) at the San Francisco, CA Passport Agency, using the identity Nagib Omar and claiming a father-son relationship with "Mosed Shaye Omar." He was issued a U.S. Passport that same day. This passport is outside the statute of limitations.

13.     A search of DOS records revealed that Claimed Son #2, MARWAN HAMOOD MOHAMED ALGHAZALI was admitted to the United States on April 14, 1992 using the name of MARWAN MOSED OMAR. On June 18, 1990, Claimed Son #2 derived U.S. citizenship using the identity MARWAN MOSED OMAR from ALGHAZALI/OMAR. On April 4, 2011, Claimed Son #2 submitted an Application for U.S. Passport (form DS-11) at the San Francisco Treasurer using the identity of MARWAN MOSED OMAR and claiming a father-son

relationship with "Mosed Shaye Omar." He was subsequently issued a U.S. passport on April 20, 2011.

14. The sworn statement that ALGHAZALI/OMAR signed at the end of the January 23, 2013 interview (the "Statement") led consular officials at the Sana'a Embassy to confiscate his U.S. Passport at that time. From within Yemen, ALGHAZALI/OMAR petitioned the Embassy for its return throughout 2013. In February 2014, he received a temporary passport that allowed him to travel from Yemen to the United States, and he did so later that month. Officers confiscated the temporary passport when ALGHAZALI/OMAR landed in San Francisco.

15. My office located a Fresno County Probation Officer's report containing an interview of Nagib Omar (Claimed Son #1) dated September 19, 2012, which was submitted to a Superior Court Judge. In this probation report, Nagib Omar told his probation officer, and through this officer, told the court, that in summary his father was deceased in Yemen.

16. On October 09, 2015, I interviewed MARWAN MOSED OMAR (Claimed Son #2) who told me that ALGHAZALI/OMAR was not his birth father.

17. On October 11, 2015, I interviewed Albdulghani Ali Mohammed Alghazali, who is both a son-in-law and nephew to ALGHAZALI/OMAR. In summary, he told me that ALGHAZALI/OMAR had changed his name from Yasin Alghazali 30 or 40 years ago to Mosed Omar, and that in Yemen, he was known as YASIN ALGHAZALI.

18. Between on or about September 17, 2015 and December 30, 2015, I or my office filed three deoxyribonucleic acid (DNA) search warrants to collect DNA from ALGHAZALI/OMAR and Nagib Omar (Claimed Son #1) from MARWAN MOSED OMAR (Claimed Son #2). Those search warrants were: 15-MJ-71223SK and 15-MJ-71610SK (Northern District of California), and 15-SW-0024-SAB (Eastern District of California). In

summary and collectively, laboratory tests determined that ALGHAZALI/OMAR was excluded as a paternal father to both claimed sons.

19. In summary, MARWAN MOSED OMAR (Claimed Son #2) admitted that ALGHAZALI/OMAR was not his father; ALGHAZALI/OMAR admitted that Claimed Son #2's name was not, in fact, MARWAN MOSED OMAR; ALGHAZALI/OMAR admitted that Claimed Son #2 was his nephew; and finally, DNA proved there was no bloodline paternal relationship between them.

**B.    ALGHAZALI/OMAR's Lawsuit and Claims of Coercion**

20. When he returned to the United States, ALGHAZALI/OMAR petitioned the State Department for the return of his passport. On September 22, 2014, the Office of Passport Services held a hearing on the issue. The Office of Passport Services denied ALGHAZALI/OMAR's petition in October 2014.

21. In April 2015, ALGHAZALI/OMAR sued the Secretary of State and other State Department officers in their official capacities, claiming that the confession he provided in the Statement had been coerced and demanding the return of his U.S. Passport and other relief. The suit was filed in this district, and the case is currently pending before Judge Corley. *See* Mosed Shaye Omar v. John Kerry, et al., Case No. 15-cv-01760 JSC. Specifically, in the civil complaint, ALGHAZALI/OMAR claims that he suffers from diabetes, high blood pressure, and other medical conditions, and that he felt ill and his vision was blurred after being interviewed and waiting at the Embassy. At the time he claims to have fallen ill, he asserted that he had no access to food, water, or his medication since arriving at the Embassy hours before. He claims that he surrendered his passport at the beginning of the interview process, and that when was in the waiting area after one session of the interview, he asked for it back from a guard. At this

point, he states that he was brought back into the interview room and was shown a paper in English – the Statement. He claimed he has limited English skills and that although there was an interpreter in the room who had earlier been interpreting the consular officer's questions and had asked questions of his own, the interpreter did not explain or translate the Statement. ALGHAZALI/OMAR further claims that his vision was too blurry to read the statement.

22. In his lawsuit, ALGHAZALI/OMAR claims that he was told that he had to sign the Statement in order to recover his passport and leave the Embassy. He asserts that he did so and provided his thumbprint, although he claims he was unaware of the contents of the Statement at the time.

23. In the civil complaint, he now claims that the factual statements set forth in the Statement are false. (*See* ¶¶ 9-12 above).

24. On September 8, 2015, Judge Corley held a hearing on a motion for preliminary injunction filed by ALGHAZALI/OMAR. The motion sought an order directing the State Department to return his passport. During that hearing, Judge Corley observed that the only facts in the record before her were from a declaration by ALGHAZALI/OMAR in which he makes the claim that he was coerced during the January 23, 2013 interview and that he did not know the contents of the Statement when he signed it. Dkt. 32, Case No. 15-cv-01760 JSC, at 5:23-6:15, 9:25-10:8 (Transcript of September 8, 2015 hearing). She noted that the Department of State defendants did not place anything in the record to contest or refute the claims in the declaration. Therefore, those factual assertions were undisputed in the record, and the record was all she could consider. *Id.*

25. Judge Corley granted the preliminary injunction on October 13, 2015. Dkt. 52, Case No. 15-cv-01760 JSC. In the order, the court adopted wholesale ALGHAZALI/OMAR's

statements about the interview and his claims of coercion. *Id.* at 2:6 – 3:27 (citing Dkt. 14-7 (a declaration ALGHAZALI /OMAR submitted in connection with the September 22, 2014 Office of Passport Services hearing)). Judge Corley found that "[b]ased on these uncontested allegations, Plaintiff has demonstrated a likelihood of success as to his contention that the statement was involuntary." *Id.* at 7:18-19 (citing Dkt. 14-7). The Court emphasized the nature of the undisputed record several times in the order. *Id.* at 7:6-7 ("The undisputed record here. . ."); 7:18-19 ("Based on these uncontested allegations. . ."); 7:25 ("Here, in contrast, the record is undisputed. . ."); and 8:13 ("the uncontested facts show. . . "). With respect to the Statement, the Court concluded that "Plaintiff signed [it] without reading or understanding [it], and only after he had been deprived of food, water, and medication for hours and was desperate for return of his passport so he could travel to the United States to obtain medical care." *Id.* at 18:14-17.

26. On February 16, 2016, Judge Corley granted summary judgment to ALGHAZALI/OMAR regarding his claims in the civil suit. Dkt. 69. Specifically, the court ruled that ALGHAZALI/OMAR was entitled to another Department of State administrative hearing within 60 days as to whether his passport could be confiscated. In the summary judgment order, Judge Corley reaffirmed the conclusions about ALGHAZALI/OMAR's statements about the interview and his claims of coercion that she made in the October 13, 2015 Order granting a preliminary injunction. *Id.*

### C.  ALGHAZALI/OMAR's Statement Was Not Coerced

27. I appreciate that Judge Corley based her conclusions on the record before her and that the record contained nothing to rebut ALGHAZALI/OMAR's claims about his experience in the interview. However, I do not believe that the Statement was coerced. Rather, based on my

training, experience, and investigation, I believe that the confessions in the Statement are accurate, as discussed below.

28. I know from my training and experience that United States law allows children born outside the United States to a U.S. citizen parent or parents to acquire or derive citizenship through those parents. I have investigated a number of cases in which a U.S. citizen parent has smuggled in unrelated children – those who lack any biological relationship with the U.S. citizen parent, or children over whom the U.S. parent does not have legal custody – into the U.S. by fraudulently acquiring citizenship for that child. This manner of fraud also includes obtaining immigrant visas fraudulently by petitioning for unrelated family members to enter the United States. This is precisely the conduct that ALGHAZALI/OMAR admitted to in the Statement, both regarding the manner in which he obtained his own citizenship and regarding the manner in which Claimed Son #1 and Claimed Son #2 derived citizenship through him.

29. I know from information provided by fellow agents who have worked in Yemen that the Embassy in Sana'a is a high fraud post. Most Yemeni vital records are not computerized, and the government of Yemen does not employ secure processes and procedures for adjudicating and maintaining vital records as many other countries do. Therefore, it can be easy for a person to assume a different identity in Yemen than their birth identity and fraudulently obtain documents to support that identity. An individual in Yemen can prove his or her identity before a government official without any documentary evidence. He or she may simply present two witnesses to attest to that person's identity and thereby obtain birth certificates, national identity cards, or Yemeni passports. Agents have observed individuals outside government offices waiting to be hired as "witnesses" for this purpose.

30.     With respect to the purportedly coercive nature of the January 23, 2013 interview, from my own experience conducting interviews of individuals seeking passports or other relief at Embassies, I know that these interviews are not designed to be coercive, even with individuals suspected of fraud. The goal is to develop information, not to obtain false confessions or statements that are not understood – or even read – by those who sign them.

31.     I am aware that it was similarly the practice of the State Department Bureau of Diplomatic Security Special Agent who conducted the interview of ALGHAZALI/OMAR to avoid any type of coercion or improper influence. I reviewed a declaration that this Special Agent signed in connection with that interview, and I learned the following about his practice in conducting such interviews.

32.     Prior to the January 23, 2013 interview of ALGHAZALI/OMAR at the Embassy in Sana'a, the agent had completed a year of Arabic training at the Department of State's Foreign Service Institute and had served as a political officer in Beirut, Lebanon and as a political military affairs officer in Baghdad, Iraq. It was his custom, however, to conduct the interviews in English, with the assistance of a Consular Fraud Investigator (CFI) who served as a translator if necessary. The CFI with whom the agent worked most commonly, and the CFI whose signature is on the Statement, was an individual who was raised in Sana'a, Yemen, and who speaks fluent Arabic.

33.     The interviews at the Sana'a Embassy were administrative in nature, and not custodial. While the individuals being interviewed would have to pass through heavy security to reach the interview rooms, they were not detained, and they were free to leave at any time. The agent who interviewed ALGHAZALI/OMAR indicated that on several occasions, he has terminated interviews as soon as someone indicated that they no longer wanted to continue. The

interview room was comfortable, air conditioned, and contained a small refrigerator with water and soft drinks. The agent often asked interviewees if they wanted a drink from the refrigerator or if they were hungry, particularly if the interview lasted longer than a couple of hours. The agent often provided such refreshment to interviewees.

34. If the person being interviewed admitted that they used a different identity, had a different name, or had different relatives, the agent asked the person to provide additional details. Once these details were provided, the agent would have the CFI escort the interviewee back to the public waiting area. While waiting in the public area, the person could leave at any time, and on occasion, interviewees did leave. While the CFI was escorting individuals back to the public area, he would often ask if the person were hungry, and he would offer to bring food from the Embassy's cafeteria. While the person was waiting, the DSS Special Agent would conduct law enforcement checks on the information the person provided, which generally took an hour. After this check, the interviewee was escorted back to the interview room, and the agent asked additional questions based on that information.

35. At the conclusion of the interview, the agent would leave to type up the person's statement. At this time, the CFI would escort the individual back to the public area once again. As before, the CFI often offered refreshment, and the interviewee was free to leave the public area at any time.

36. Once the statement was finished, the interviewee was escorted back to the interview room, and the Special Agent and the interviewee reviewed its contents. The statement was in English, and the interviewee and the agent went over it, line by line, with the assistance of the CFI as a translator, if necessary, reading each line in English and Arabic. With each page, the interviewee was asked if it was accurate, and if so, the person initialed the page and provided

a fingerprint. If any corrections were needed, it was the agent's practice to cross out any mistakes and to write in the correct information. The interviewee, the CFI, and the agent would then initial each correction. Once the entire statement was read and reviewed in this manner, and the interviewee confirmed its accuracy, the person signed it or provided a fingerprint. This process took between 30 minutes to an hour, depending on the length of the statement. If during this process, the person indicated that they did not want to continue or wanted an attorney, the agent terminated the interview, and the person left the Embassy.

37. With respect to the ALGHAZALI/OMAR's claim that he was denied food, water, and access to medicine, and therefore suffered blurry vision due to diabetes and low blood sugar, rendering him incapable of reading or understanding the Statement, I learned the following from the agent who conducted the interview: (1) The agent is a trained Emergency Medical Technician and has been for 20 years; (2) he has served as a medic with the State Department's Tactical Team; (3) he served as the Trauma Coordinator at the Sana'a Embassy; (4) if he noted any medical issues during an interview, it was his practice to suspend the interview and request assistance from the Embassy nurse; (5) he is extremely familiar with the symptoms of low blood sugar, diabetes, and heart problems, and he has treated individuals for those problems; (6) and he has specific knowledge regarding diabetes because his father is diabetic.

38. With respect to ALGHAZALI/OMAR's claim that he could not understand the Statement because his English was too poor, I do not have any knowledge of his English proficiency. I noted that his declaration submitted in connection with the September 22, 2014 Office of Passport Services contains an Arabic interpreter's declaration, but I also note that ALGHAZALI/OMAR has been a resident of the United States for forty-three years and a citizen for thirty-seven years. *See* Dkt. 14-7 at 7.

39. I believe that it is important to note a distinction between ALGHAZALI/OMAR's claims regarding the nature of the interview and the claims in the lawsuit that the factual assertions in the Statement. In his declaration, ALGHAZALI/OMAR makes a number of claims – that the interview was coercive; that he was denied food, water, and access to medicine; that he suffered blurry vision and did not read the Statement when he signed it; that the Statement was not translated to him; that he was lied to about what would happen once he signed; and others. Dkt. 14-7. These claims are made under penalty of perjury. *Id.* at 7. At no point in that declaration, however, does ALGHAZALI/OMAR assert that the facts in the Statement – he was smuggled to the U.S. by an individual claiming to be his adopted father under a false name; that he naturalized as a U.S. citizen under that false name; that he smuggled two relatives to the U.S. under false names and falsely claimed them as his biological sons, etc. – are not accurate. The declaration is silent on these facts. The closest ALGHAZALI/OMAR comes to claiming that the Statement is false is the following: "If I knew what the statement said, I never would have signed it. If I knew what would happen after I signed it, that I would not get my passport back, I would never have signed it." *Id.* ¶ 29.

40. It is only Plaintiff's Complaint in the suit before Judge Corley that alleges that the contents of the Statement are actually false. Dkt. 1, Case No. 15-cv-01760 JSC, ¶ 3 (true name), ¶ 61 (same), ¶ 62 (smuggled into the United States by an uncle), ¶ 63 (false names for claimed children). However, the Complaint is signed by his counsel, not ALGHAZALI/OMAR.

41. On February 16, 2016, Judge Corley ruled that ALGHAZALI/OMAR was entitled to another Department of State administrative hearing within 60 days, as to whether his passport could be confiscated, and she left in place a previous order allowing him to possess a United States passport in the name of MOSED SHAYE OMAR.

## INSTANCES OF PASSPORT FRAUD

42. As mentioned in Paragraph 13, Claimed Son #2 (MARWAN HAMOOD MOHAMED ALGHAZALI) filed an application for a United States passport for himself at the San Francisco Treasurer's Office on April 4, 2011, using the identity MARWAN MOSED OMAR in Box 1, and he listed his father's name as Mosed Shaye Omar in Box 10. Based on my training and experience and the facts listed above, I believe probable cause exists that MARWAN HAMOOD MOHAMED ALGHAZALI willfully and knowingly falsely stated that his father was Mosed Shaye Omar, when in truth and in fact, he knew this was not true.

## CONCLUSION

43. Based on the foregoing, I submit there is probable cause to believe that MARWAN HAMOOD MOHAMED ALGHAZALI aka MARWAN MOSED OMAR violated 18 U.S.C. § 1542, False Statement in Application for a Passport.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

Aaron Ure
Special Agent,
Diplomatic Security Service
San Francisco Field Office

Subscribed and sworn to before me this 15th day of March, 2016.

Hon. Joseph C. Spero
Chief Magistrate Judge